IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| FUMIKO IWASAKI,<br><br>Plaintiff,<br><br>v.<br><br>BREEZE AVIATION GROUNP, INC, and DOES 1-100,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>No. 2:24-cv-00817-RJS-DBP<br><br>District Judge Robert J. Shelby<br><br>Magistrate Judge Dustin B. Pead |

This action arises out of Plaintiff Fumiko Iwasaki's termination from her employer Defendant Breeze Aviation Group, Inc. (Breeze).  Pending before the court is Breeze's Motion for Summary Judgment.[1]  For the reasons explained below, the Motion is granted.

**EVIDENTIARY OBJECTIONS**

Before turning to the facts pertinent to Breeze's Motion, the court addresses several evidentiary objections made by the parties.

Under Federal Rule of Civil Procedure 56, a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."[2] As the Tenth Circuit has explained, this rule "does not mean that [summary judgment] evidence must be submitted 'in a form that would be admissible at trial.'"[3]

---

[1] Dkt. 42, *Defendant's Motion for Summary Judgment* (*Motion*).

[2] Fed. R. Civ. P. 56(c)(2).

[3] *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

*A. Breeze's Evidentiary Objections*

Breeze's evidentiary objections are denied as moot.  The court considers all evidence proffered by Iwasaki to resolve this Motion and concludes Breeze is entitled to summary judgment on all claims.

*B. Federal Rule of Evidence 350 Objections*

Iwasaki objects to some evidence based on Federal Rule of Evidence (FRE) 350.[4] Because no such FRE exists,[5] this objection is overruled.

*C. Federal Rule of Evidence 403 Objections*

Iwasaki objects to some evidence on FRE 403 grounds.[6]  FRE 403 provides, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[7]  This objection is overruled. At this stage, Iwasaki fails to meet her burden of showing there is no way for the probative value of the evidence to outweigh the danger of the evidence.[8]

*D. Federal Rule of Evidence 404 Objections*

Iwasaki objects to some evidence as impermissible character evidence.[9]  FRE 404 provides, "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."[10]  Because none of

---

[4] *See* Dkt. 46, *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment* (*Opposition*) at 5 n.1.

[5] *See generally* Fed. Rs. Evid.

[6] *See Opposition* at 5 n.1.

[7] Fed. R. Evid. 403.

[8] *See Trevizo*, 455 F.3d at 1160.

[9] *See Opposition* at 13 n.9.

[10] Fed. R. Evid. 404(1).

the objected to testimony is being used to show the person acted in accordance with her character, this objection is overruled.

### E. Federal Rule of Evidence 602 Objections

Iwasaki objects to some evidence on FRE 602 grounds.  FRE 602 provides, "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."[11]  The objections are overruled.  The court concludes the record supports finding that the testifying witnesses had personal knowledge of each of the matters objected to.

### F. Federal Rule of Evidence 701 Objections

Iwasaki objects to some evidence as impermissible lay witness testimony.  FRE 701 provides, "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."[12]  These objections are overruled.  The objected-to testimony is merely permissible characterizations of what the witness perceived.

### G. Federal Rule of Evidence 702 Objections

Iwasaki objects to some evidence on FRE 702 grounds.[13]  FRE 702 governs the testimony of expert witnesses.[14]  Because no party offers an expert witness, this objection is overruled.

---

[11] Fed. R. Evid. 602; *see also Raynor Mfg. Co/ v Raynor Door Co., Inc.*, No. 7-2421-DJW, 2009 WL 211942, *4 (Jan. 27, 2009) (stating under FRE 602 at summary judgment stage, "a witness cannot testify to a matter unless there is evidence to support a finding that the witness has personal knowledge of the matter").

[12] Fed. R. Evid. 701.

[13] *See Opposition* at 5 n.1, 10 n.7.

[14] *See* Fed. R. Evid. 702.

3

### H.  Hearsay Objections

Iwasaki lodges various hearsay objections.  Under FRE 801, "'Hearsay' means a statement that: (1) the declarant does not make while testifying  . . and (2) a party offers in evidence to prove the truth of the matter asserted."[15]  When a hearsay objection is raised at summary judgment, the proponent of the evidence must point the court to an "applicable exception to the hearsay rule."[16]  If no exception applies, the court should accord no weight to hearsay statements in resolving a motion for summary judgment.[17]  The court considers each statement that Iwasaki objects to and overrules each objection.

Iwasaki objects to the reports Breeze received after placing her on the Performance Improvement Plan (PIP).[18]  These objections are overruled.  The statements are not being offered for the truth of the matter asserted—for example, whether Iwasaki indeed called another inflight instructor "autistic" or "fag hag" or spread rumors about other employee's romantic relationships.[19]  Instead, the statements are being offered for the effect they had on Breeze as the listener—the employer who was receiving multiple reports of misconduct by an employee already on a PIP.

Iwasaki objects to the statements regarding the termination reasons said to her during her termination meeting "to the extent it is offered for the truth of the matter asserted."[20]  But the

---

[15] Fed. R. Evid. 801(c).

[16] *Young v. Dillon Co., Inc.*, 468 F.3d 1243, 1252 (10th Cir. 2006); *see also PAS Comms., Inc. v. Sprint Corp.*, 139 F. Supp. 2d 1149, 1179–80 (D. Kan. 2001) (requiring proponent of evidence to show exception to hearsay applies).

[17] *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1555 (10th Cir. 1995).

[18] *Motion, Statement of Undisputed Material Facts (SOF)* ¶¶ 5–6, 34; *Opposition, Response to Defendant's Statement of Undisputed Material Facts (RSOF)* ¶¶ 5–6, 34.

[19] *See SOF* ¶ 5.

[20] *RSOF* ¶ 9.

evidence is not hearsay. The deposition testimonies of Heidi Darling, Rachel Finklea, Sandra Maggie Decell, and Iwasaki were made while testifying.[21]

Iwasaki also objects to the statements regarding People Services' investigation and Dina Roberson's characterization of the results.[22] But this is not hearsay. Roberson and Heidi Darling were subject to cross-examination and there is no indication they will not be available at trial.

## BACKGROUND[23]

From May 2023 to January 2024, Breeze employed Iwasaki as an Inflight Instructor.[24] Her salary was $60,000, which was the same amount or more than her male Inflight Instructor colleagues.[25] As an Inflight Instructor, Iwasaki was required to strictly abide by curriculum approved by the Federal Aviation Administration (FAA).[26] Norma Jean McVey, a Special Assignment Flight Attendant temporarily assigned to help teach flight attendant trainees, assisted Iwasaki in the classroom.[27]

---

[21] *See* Fed. R. Evid. 801(d)(1).

[22] *RSOF* ¶ 33 n.10.

[23] The following facts are drawn from the parties' summary judgment briefing and attached exhibits. *See* Fed. R. Civ. P. 56(c). The facts are either undisputed, or where genuinely disputed, stated in the light more favorable to the party opposing summary judgment. *Scott v. Harris,* 550 U.S. 372, 378 (2007). The court draws all inferences in the light most favorable to the nonmovant. *See Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). Facts identified in the parties' briefing that do not appear here are either disputed; not supported by cited evidence; not material; or are not facts, but rather, are characterization of facts or legal argument.

[24] *SOF* ¶¶ 1, 9; *see also RSOF* ¶¶ 1, 9.

[25] *SOF* ¶¶ 1, 2.

[26] *Id.* ¶ 3.

[27] Dkt. 42-9, *Exhibit* 1 (*Roberson Dep.*) at 222:17–19; Dkt. 46-2, *Exhibit 2* (*Iwasaki Dep.*) at 161:1–4; Dkt. 46-3, *Exhibit 3* at 6. The parties both argue the other party's purported undisputed facts are disputed. *See RSOF*; *Opposition*, *Plaintiff's Statement of Additional Material Facts* (*AMF*); Dkt. 51-5, *Exhibit P*, *Defendant's Response to AMF* (*RAMF*). The court has reviewed every dispute and evidence cited in support therein. Where the record does not support the dispute, this order will directly cite to the evidence that supports the proposition. In doing so, the court concludes there is no genuine dispute as to the proposition and rejects the opposing party's dispute. Where there is a genuine dispute, this order so indicates or presents the evidence in the light most favorable to Iwasaki as the nonmovant. *See Scott,* 550 U.S. at 378.

Iwasaki reported to the Supervisors of Inflight Training, Sandra Maggie Decell and Rachel Finklea.[28] Decell and Finklea were supervised by the Manager of Inflight Training, Rachael Cookson.[29] Cookson reported to the Director of Inflight, Heidi Darling.[30]

The Manager of Breeze's Human Resources (HR) Department, People Services, was Dina Roberson.[31] People Services does not have final decision-making power to hire or fire Breeze employees, but rather recommends termination to management personnel, who have final decision-making power.[32]

### A.   Iwasaki Complains of Discrimination During Her Tenure

In July 2023, Iwasaki complained that a disproportionate number of minority trainees were failing their exams compared to non-minority trainees.[33]

In November 2023, Iwasaki raised concerns that Cookson was engaging in gender-based discrimination.[34] Iwasaki told Roberson she was being treated differently than her male colleagues.[35] Specifically, Iwasaki had observed Cookson berating and yelling at female instructors but not engaging in the same behavior toward the male instructors.[36] She also told Roberson that Cookson had said, "we need to hire more men, women are too emotional" during a

---

[28] *SOF ¶¶ 4–5; see AMF ¶ 1;* Dkt. 42-11, *Exhibit J (Decell Dep.)* at 13:22–14:1; Dkt. 42-10, *Exhibit I (Finklea Dep.)* at 64:20–24 (testifying she was an interim supervisor in January 2024).

[29] *SOF ¶ 5; AMF ¶ 1; see also Exhibit 3* at 18; *Roberson Dep.* 12:4–5.

[30] *SOF ¶ 8; see also* Dkt. 42-8, *Exhibit G (Darling Dep.)* at 11:22–12:1.

[31] *SOF ¶ 26.*

[32] *Roberson Dep.* at 12:23–13:8, 157:6–13.

[33] *SOF ¶ 29; AMF ¶ 8.*

[34] *AMF ¶ 3; RAMF ¶ 3.*

[35] *SOF ¶ 31.*

[36] *Iwasaki Dep.* at 131:25–132:10.

team meeting.[37]  Iwasaki said she had made a similar report to Darling who was also present at the relevant meeting.[38]  When Roberson followed up with Darling, Darling said she was present for the comment, that Cookson "didn't say she needed to hire men because women are emotional" but rather "said we need some male instructors to balance the team out."[39]  Multiple other employees had also reported concerns regarding Cookson's treatment of female employees.[40]

Cookson had a reputation for being a harsh, vindicative supervisor,[41] who yelled and used profanity in the classroom and made Breeze personnel cry.[42]  Indeed, Cookson's unprofessional behavior led to her own termination in March 2024.[43]  When Cookson became aware of Iwasaki's complaint, she was extremely angry.[44]

People Services conducted an investigation of Iwasaki's complaints.[45]  Iwasaki alleges the investigation was a sham.[46]  She alleges that People Services never took her complaints

---

[37] *SOF* ¶ 30; *see also Roberson Dep.* at 44:22-45:3; *Exhibit 3* at 122 (investigation found "hire more men also said in group setting in jest by Manager in front of others who took as joke"); Dkt. 46-11, *Declaration of Fumiko Iwasaki* (*Iwasaki Declaration*) ¶ 10.  Breeze argues the court should not consider Iwasaki's Declaration, contending it is self-serving, conjecture, and contradicts her deposition testimony.  *Reply* at 4–5.  The court declines to exclude the declaration entirely.  The court considers Iwasaki's Declaration mindful that a plaintiff's "unsupported opinion is not sufficient to establish a genuine issue" of fact.  *Jones v. Azar*, 772 F. App'x 692, 697 (10th Cir. 2019).

[38] *SOF* ¶ 30.

[39] Dkt. 50-1, *Corrected Exhibit A* (*Exhibit* A) at 200; *see also SOF* ¶ 30.

[40] *AMF* ¶ 4; *RAMF* ¶ 4.

[41] *AMF* ¶¶ 2, 5; *RAMF* ¶¶ 2, 5.

[42] *AMF* ¶ 30; *RAMF* ¶ 30.

[43] Dkt. 51-4, *Exhibit O* at 7 (notes from phone call terminating Cookson).

[44] *AMF* ¶ 6; *RAMF* ¶ 6 (disputing how Cookson learned of the complaint, but not Cookson's anger in response to finding out).

[45] *SOF* ¶ 33; *RSOF* ¶ 33 (disputing the meaningfulness of the investigation but evidence cited does not support that fact).

[46] *AMF* ¶ 22.

seriously because they "wanted to get" her.[47]  Instead, Iwasaki believes, People Services took Cookson's side of the story at face value and effectively ignored her complaints.[48]

### B.  Performance Issues Reported Against Iwasaki

On August 21, 2023, Iwasaki was placed on a PIP for "straying from the [FAA-approved] curriculum."[49]  Iwasaki believes this stated reason was pretextual, and rather she was placed on a PIP in retaliation for her complaints about workplace discrimination.[50]

After being placed on the PIP, Breeze received reports that Iwasaki had engaged in the following misconduct: (1) provided extra coaching during trainees' lunch; (2) taught content that was not part of the lesson plan; (3) based trainings on her previous airline experience, rather than on Breeze's FAA-approved curriculum; (4) called another inflight instructor autistic and used the term "fag hag"; (5) violated a non-disclosure agreement protecting Breeze's confidential information; (6) helped a trainee cheat on a test; (7) spread rumors about other employees' romantic relationships; (8) taught trainees in an unapproved manner; and (9) yelled at a flight attendant trainee.[51]

In November 2023, shortly after Iwasaki made her gender-based discrimination complaint, Cookson recommended Iwasaki be terminated.[52]  On December 4, 2023, Roberson

---

[47] *Iwasaki Dep.* at 145:19–25; 146:21–147:24.

[48] *Id.* at 248:2–5.

[49] *SOF* ¶¶ 3–4; *RSOF* ¶ 4 (disputing the reason for the PIP but not the PIP itself).

[50] *RSOF* ¶ 4; *Iwasaki Dep.* at 149:12–150:24; *Iwasaki Declaration* ¶¶ 5–6. Iwasaki cites no record evidence in support of her belief other than her own deposition testimony and declaration. The Tenth Circuit instructs the court to disregard statements of mere belief.  *Argo v. Blue Cross Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (quoting *Tavery v. United States,* 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)).

[51] *SOF* ¶ 5; *RSOF* ¶ 5; *Exhibit A* at 32–33.  In her RSOF, Iwasaki disputes whether she in fact engaged in this behavior but does not dispute Breeze received such reports.

[52] *AMF* ¶ 21; *RAMF* ¶ 21.

responded to Cookson's recommendation in an email that included Cookson, Darling, and Decell:

> I am sorry – but we will have to wait and see how she does/for a while. She brought forward a complaint and I haven't fully investigated it or responded to her (and others) and if we terminate her right now, it will reek of retaliation. Document and speak to her real time if she does anything wrong – since Maggie [Decell] talked to her and then we can talk about it again, but not terminate for now. She should not talk about what she shouldn't (outside curriculum – instruct or train when she should not – or against what guideline she's been given (e.g. if she shares about something with a group, then it should be shared in class and by the assigned instructor – as she is not teaching approve curriculum). Prepare documents when she goes against coaching, etc. For now, we cannot term to protect the company. I would also recommend Maggie [Decell] speak to her as her direct supervisor if she does go against the coaching she received. Also, if she goes off the rails and does something egregious, call me and let's talk it through what to do about that day's violation. Heidi [Darling] will also have some initial coaching for you about some things that have been reported to me.[53]

In November or December 2023, Breeze received reports that Iwasaki helped a trainee cheat on a test.[54] The trainee told Inflight Instructor Kevin Casullo that Iwasaki helped her on a test.[55] Casullo raised the issue with Cookson.[56] Cookson informed Darling and contacted the trainee.[57] Casullo and Cookson both provided People Services with statements, which Roberson edited.[58]

---

[53] *Exhibit 3* at 31.

[54] *SOF* ¶ 5(f); *RSOF* ¶ 5(f) (disputing whether Iwasaki in fact engaged in this behavior but not disputing that Breeze received such reports).

[55] *Exhibit 3* at 39 (Casullo statement summarizing cheating allegations); *id.* at 2 (Cookson statement summarizing cheating allegations).

[56] *Id.* at 2, 39 (Cookson and Casullo statements summarizing cheating allegations).

[57] *Id.*; *see also id.* at 119 (Cookson email to Napierski quoting the Flight Attendant Playbook, which requires "[f]ull cooperation" with investigations, and requesting she "provide a written statement regarding the assistance [she] received during the A220 exam").

[58] *Id.* at 2, 36–39 (Cookson and Casullo statements summarizing cheating allegations).

Breeze also received reports that Iwasaki intentionally deviated from her supervisor Finklea's instructions.[59] On January 19, 2024, Breeze issued Iwasaki a written warning for the deviation and for teaching trainees in an unapproved manner.[60]

### C. The Incident with Trainee Dailey and Follow Up Investigation

On January 23, 2024, an incident occurred during class between Iwasaki and trainee Anita Dailey (Dailey Incident).[61] The only instructor to witness the incident was Norma Jean McVey.[62] Dailey emailed a statement to People Resources the morning of the incident:

> This morning we were tasked with an easy check. I got my items out for check. Norma Jean was aware I had wi-fi issues but that I should make sure any new items should be acknowledged before the start of class. I checked my iPad and there was 1 new publication in orange. I downloaded it. Norma Jean said she would come back to me. In the interim, I raised my hand and asked Fumiko [Iwasaki] to come over. I tried to show her my last cloud sync at 6:04am this morning. When I did, Fumiko says, Anita, you don't have to be connected to wi-fi to upload new publications. So, I try to tell her I've been having issues with wi-fi here and at hotel and then she YELLS at me, in front of the entire classroom…"YOU DON'T HAVE TO BE CONNECTED TO WI-FI, ARE YOU GONNA ARGUE WITH ME? then she takes my iPad out of my hands and starts condescendingly explaining what I need to do. But still yelling. I asked her not to yell at me and then told her I was going to step outside to gather my thoughts.[63]

Dailey sent the email directly to People Services and Roberson responded.[64]

That same day, Iwasaki sent a message to a coworker describing the incident:

> I let the stress get the best of me this morning.. I felt like a student was very combative w me and went was [sic] harsh with her. It

---

[59] *SOF* ¶ 5(h); *RSOF* ¶ 5(h) (disputing whether Iwasaki in fact engaged in this behavior but not disputing that Breeze received such reports).

[60] *SOF* ¶ 5(h); *RSOF* ¶ 5(h).

[61] *SOF* ¶ 5(i); *RSOF* ¶ 5(i); *Exhibit 3* at 4–7.

[62] *Exhibit 3* at 4–7.

[63] *Exhibit A* at 9–10 (Dailey Statement); *see also Roberson Dep.* at 230:17–231:6 (testifying Dailey's statement was not edited by People Services).

[64] *Exhibit A* at 8–10 (Dailey Statement).

was a shock to her that I would be so stern being that I'm probably the easiest person.  So she went to go talk to Rachel Fink and I'm sure that's the nail in the coffin they need to get rid of me.[65]

Also that day, McVey told Cookson and Finklea about the Dailey Incident.[66]  Cookson was working remotely that month due to a back injury.[67]  Cookson directed McVey to send a statement to People Services summarizing what happened from her point of view.[68]  Her statement describes the incident as follows:

> At the time I reached the last row of the classroom, I heard Fumiko and Anita talking and all of a sudden Fumiko raised her voice and I heard, "Are you seriously going to argue with me about this?" At this point as to not draw attention, I continued on with the students. . . .
>
> Anita came to me at the back of the class and asked, "Norma Jean, how do I make a report to HR?" She was visibly upset with tears in her eyes.  I told her I will come and speak with her.
>
> I went to talk to Fumiko outside the classroom . . . Fumiko stated to me that she felt Anita was being argumentative and was not listening to her. . . . Fumiko stated she wanted to apologize to her and would like to talk to her and fix this.  I then told Fumiko, "I'm going to be completely honest with you, she has asked to speak to HR, so I highly doubt she would agree to talk with you." . . .
>
> I let Rachel Cookson and Rachel Finklea know about the situation at hand.  . . . Cookson instructed me to have Anita write a statement (as well as myself) and sent it to People Services.  I had informed Rachel Cookson that I had already instructed Anita, if she was wanting to report anything to HR, it would be best to start writing down a detailed statement while it was fresh in her head.
>
> I went back into the classroom where Anita was and instructed her that when she was ready, she could send her statement to Breeze HR and I provided her with the email address.

---

[65] *Exhibit B* at 73 (Teams message between Iwasaki and Carlin Cook); *Iwasaki Dep.* at 169:9–173:13 (testifying that this message described the incident with trainee Dailey).

[66] *Exhibit A* at 4–5 (McVey Statement).

[67] Dkt. 46-4, *Exhibit 4* (*Darling Dep.*) at 59:1–17.

[68] *Exhibit A* at 4–5 (McVey Statement summarizing Dailey Incident); *see also Roberson Dep.* at 224:16–225:25 (testifying McVey first reached out to Cookson who told her to write a statement to give to Roberson).

I stayed with Anita because she was visibly upset and crying.  . . .[69] McVey emailed her statement to Roberson.[70]  After receiving McVey's statement, Roberson followed up with some clarifying questions, including "can the students get what they need on the iPad without the internet? Was Anita [Dailey] incorrect and Fumiko [Iwasaki] correct – about the process?"[71]

That same day, Roberson contacted Decell to better understand the Wifi-connectivity issues that led to the yelling incident.[72]  Per Roberson's request, Decell sought further information from another individual named Molly and relayed it back to Roberson.[73]  Roberson did not speak to Iwasaki about the Dailey Incident.[74]  She also did not recall speaking to Cookson about the incident.[75]

Based primarily on the statements from McVey and Dailey, Roberson created an investigative report that ultimately recommended terminating Iwasaki.[76]  On January 25, 2024, Roberson emailed Darling indicating her investigation into the Dailey Incident was complete and attaching a summary of the investigation.[77]  She copied Decell and Finklea to the email, but did not include Cookson.[78]  Her report summarized the incident; concluded Iwasaki violated

---

[69] *Exhibit A* at 4–5 (McVey Statement summarizing Dailey Incident).

[70] *Id.*

[71] *Exhibit O* at 2–4 (email exchange between Roberson and McVey regarding McVey's statement); *see also Roberson Dep.* at 225:24–227:4 (testifying that she discussed the statement with McVey).

[72] *Exhibit 3* at 124–29 (messages between Roberson and Decell on January 23, 2024).

[73] *Id.*

[74] *Exhibit A* at 195–97.

[75] *Roberson Dep.* at 224:16–225:23.

[76] *Id.* at 230:17–20 (testifying her sources for information from the yelling incident were Daley and McVey); *SOF* ¶ 6; *RSOF* ¶ 6 (not disputing Roberson's recommendation); *see also Exhibit A* at 196–97 (Roberson summary of yelling incident investigation concluding "Inflight leadership should consider separating Ms. Iwasaki's employment").

[77] *Exhibit A* at 195–97 (Roberson's email and summary).

[78] *Id.*

Breeze's values of kindness, integrity, and excellence; referenced her other disciplinary issues; and concluded "leadership should consider separating Ms. Iwasaki's employment."[79]

Based on Roberson's recommendation, Darling testified she made the decision to terminate Iwasaki.[80] Iwasaki disputes whether the decision was made solely by Darling.[81] She cites the following evidence as creating a genuine dispute of material fact: Roberson testified that she believed Finklea and Cookson made the decision to terminate Iwasaki.[82] Immediately after testifying that she believed Racheal Cookson made the decision to terminate, Roberson clarified that she meant Rachel Finklea and it was not Rachel Cookson at all.[83] Iwasaki also cites: Finklea testified that she was not involved in the decision to terminate and that the termination discussion involved Darling, Roberson, and Cookson;[84] Finklea also testified that Darling said she would consult Cookson before the termination;[85] and Decell testified that Cookson was the manager and had final say over terminating instructors within her department, but that Darling "would have had final say over" Cookson.[86] Iwasaki also cites a one page spreadsheet that has no title but appears to be some form of termination tracker.[87] The first row of the spreadsheet states an inflight instructor was terminated in January 2024 for "training trainee incorrect[ly] and on-FAA

---

[79] *Id.* at 196–97 (Roberson report).

[80] *Darling Dep.* at 61:1–63:21 (testifying she made the final decision to terminate Iwasaki); *see also SOF* ¶ 8.

[81] *RSOF* ¶ 8.

[82] *Roberson Dep.* at 59:18–24 (Finklea); *id.* at 219:4–8 (Cookson).

[83] *Id.* at 220:5–14 ("Q. But again it was Rachael Cookson that made the decision to terminate Ms. Iwasaki? A. No, Rachel Finklea. Q: Rachel – A. Finklea. Q. – I've been saying Cookson. So you're saying it was Rachel Finklea? A. Yes. Q. It was not Racheal Cookson at all? A. No.").

[84] *Finklea Dep.* at 68:3–15.

[85] *Id.* at 69:2–20.

[86] *Decell Dep.* at 38:24–39:2, 154:21–155:7.

[87] *Exhibit 3* at 61.

approved curriculum."[88]  Decell testified that this row refers to Iwasaki.[89]  The spreadsheet

identifies the "Decision Maker" as Cookson.[90]  No witness was able to explain who created this

document or otherwise provide any foundation.  Roberson did not recall the document but

commented that it resembled a similar document she used to track employee terminations.[91]

Darling testified she had never seen it and that it contained inaccurate information.[92]  Decell

testified that the document listing Cookson does not mean she was the final decisionmaker since

Darling is the Director.[93]

### D.  Iwasaki's Termination

On January 29, 2024, two days after the Dailey Incident, Breeze terminated Iwasaki.[94]

The meeting included Decell, Darling, Roberson, and Iwasaki.[95]  The stated final reason for

Iwasaki's termination was Roberson's investigation and recommendation after the Dailey

Incident.[96]  People Services did not interview Iwasaki related to the Dailey Incident, involve her

in the investigation, or make her aware of the cheating or yelling allegations prior to her

termination.[97]

---

[88] *Id.*

[89] *Decell Dep.* at 90:7–12.

[90] *Exhibit 3* at 61.

[91] *Roberson Dep.* at 206:21–208:24 (Ms. Roberson not recalling the document, although commenting it resembled something she used to track employee complaints).

[92] *Darling Dep.* at 94:11–95:20 (Ms. Darling stating she had never seen the document and it contained inaccurate information).

[93] *Decell* at 90:1–92:5 (Ms. Decell not being asked foundational questions but stating the document's listing of Ms. Cookson's name does not mean she was the final decisionmaker for Plaintiff's termination).

[94] *SOF* ¶ 9.  Iwasaki disputes the fact that she was terminated and instead posits that she was offered a severance package contingent on her voluntarily resigning.  *See RSOF* ¶ 9.  The court notes this distinction but finds it immaterial for the purposes of this order.

[95] *Id.*

[96] *Id.*; *Exhibit A* at 41.

[97] *AMF* ¶ 31.

## PROCEDURAL HISTORY

On October 31, 2024, after receiving a right to sue letter from the Equal Employment Opportunity Commission, Iwasaki filed her Complaint against Breeze alleging violations of the Equal Pay Act (EPA), Title VII, and 42 U.S.C. § 1981.[98]  On January 12, 2026, Breeze filed its Motion seeking summary judgment on every claim.[99]  The Motion is fully briefed and ripe for review.[100]  On June 16, 2026, the court heard oral argument.[101]

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[102]  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[103]  A fact is material if it could "affect the outcome of the suit" under the governing substantive law.[104]  In applying these standards, the court views the evidence and draws inferences in the light most favorable to the nonmoving party.[105]  While these inferences must be plausible, "the court should not weigh the evidence, make credibility determinations, or assess the credibility of conflicting testimony at the summary judgment stage."[106]

---

[98] Dkt. 1, *Complaint for Damages* (*Complaint*); Dkt. 1-2, *Determination and Notice of Rights*.

[99] *Motion*.

[100] *See Opposition*; Dkt. 51, *Reply in Support of Defendant's Motion for Summary Judgment* (*Reply*); Dkt. 56, *Surreply in Further Opposition to Defendant's Motion for Summary Judgment* (*Sur-Reply*).

[101] Dkt. 58, *Minute Entry*.

[102] Fed. R. Civ. P. 56(a).

[103] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[104] *Id.*; *see also United States v. Simons*, 129 F.3d 1386, 1388 (10th Cir. 1997) ("The substantive law of the case determines which facts are material.").

[105] *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

[106] *Lazy S Ranch Props., LLC v. Valero Terminaling & Dist. Co.*, 92 F.4th 1189, 1198 (10th Cir. 2024).

"The movant bears the initial burden to show the absence of a genuine issue of material fact."[107]  "When, as in this case, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy this burden by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."[108]  Then, "the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue for trial."[109]

**ANALYSIS**

Breeze seeks summary judgment on all of Iwasaki's claims.  The claims fall within three categories: the EPA claim, the Title VII discrimination claim, and the retaliation claims under Title VII and § 1981.  The court will address each category in turn.

### I.        Equal Pay Act Claim

To survive summary judgment on an EPA claim, Iwasaki must make a prima facie showing that male employees performing similar jobs were paid more than her.[110]  Recognizing "[p]ayroll records produced for the first time in discovery demonstrate that Plaintiff cannot establish a genuine dispute of material fact as to whether similarly situated male inflight instructors were paid more than she was during the relevant period," Iwasaki concedes this claim.[111]  Accordingly, Breeze is entitled to summary judgment on the EPA claim.

---

[107] *Id.*

[108] *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000) (internal quotation marks and citation omitted).

[109] *Lazy S Ranch Props.*, 92 F.4th at 1198 (quoting *Liberty Lobby*, 477 U.S. at 250); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[110] *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006); *see also Miller v. Auto. Club of N.M., Inc.*, 420 F.3d 1098, 1114 (10th Cir. 2005).

[111] *Opposition* at 27.

### II.    Title VII Discrimination Claim

Iwasaki brings a discrimination claim under Title VII.[112]  Title VII "bars employers from intentionally discriminating against their employees on the basis of . . . sex . . ."[113]  Because Iwasaki attempts to establish her claim through circumstantial evidence, the *McDonnell Douglas* burden-shifting framework applies.[114]  Under the first step of this framework, Iwasaki has the burden of presenting a prima facie case of discrimination.[115]  If she makes this showing, the burden shifts to Breeze "to articulate a legitimate, non-discriminatory reason for its actions."[116] Satisfying the first and second *McDonnell Douglas* steps is a light burden.[117]  At the third and final step, Iwasaki has the burden "to prove [Breeze's] articulated reasons are pretextual."[118] The court addresses each step in turn.

#### A.    Prima Facie Case of Discrimination

To make a prima facie case under Title VII, Iwasaki must demonstrate (1) "she is a member of a protected class," (2) "she suffered an adverse employment action," and (3) "the challenged action occurred during circumstances giving rise to an inference of discrimination."[119]  Establishing a prima facie case is "not onerous."[120]  Here, Breeze does not

---

[112] *Complaint* ¶¶ 83–90.

[113] *Ames. v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308 (2025) (citing 42 U.S.C. § 2000e–2(a)(1)).

[114] *See McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1137 (10th Cir. 2024); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[115] *Walkingstick Dixon v. Okla. ex rel. Reg. Univ. Sys. of Okla. Bd. of Regents*, 125 F.4th 1321, 1334 (10th Cir. 2025) (quoting *Throupe v. Univ. of Denv.*, 988 F.3d 1243, 1251 (10th Cir. 2021)).

[116] *Id.*

[117] *Guy v. McDonough*, No. 20-6158, 2021 WL 3854764, at *2 (10th Cir. Aug. 30, 2021).

[118] *Walkingstick Dixon*, 125 F.4th at 1334.

[119] *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015).

[120] *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015) (quoting *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005)).

contest that Iwasaki satisfies the first two elements: she is a member of a protected class as a woman, and she suffered an adverse employment action by being terminated.[121]  The only element at issue is whether the circumstances of her termination give to an inference of sex discrimination.[122]  Because her claim fails at step three, as discussed below, the court will assume without deciding that Iwasaki meets her light burden of establishing a prima facie case.[123]

> **B.    Legitimate, Non-Discriminatory Reasons for Iwasaki's Termination**

The second step under *McDonnell Douglas* requires Breeze to "articulate some legitimate, nondiscriminatory reason" for its decision to terminate Iwasaki.[124]  "The defendant's burden at this stage is one of production, not one of persuasion."[125]

Breeze articulates the following reasons for Iwasaki's termination: "(1) violation of the company values of 'kindness, integrity, and excellence,' (2) gossiping about coworkers, (3) violating a nondisclosure agreement for Breeze's confidential information, and (4) being unwilling to receive correction from her supervisors."[126]  Iwasaki concedes these are nondiscriminatory reasons and Breeze satisfies its burden under the second step of *McDonnell Douglas*.[127]

> **C.    Pretext**

Under the third step, Iwasaki has the burden of establishing Breeze's "articulated reasons are pretextual."[128]  "The critical question regarding this aspect of the *McDonnell Douglas* rubric

---

[121] *Motion* at 18.

[122] *Id.*

[123] *See Guy*, 2021 WL 3854764, at *2.

[124] *McDonnel Douglas*, 411 U.S. at 802.

[125] *Horizon/CMS Healthcare Corp.*, 220 F.3d at 1191.

[126] *Motion* at 20.

[127] *Opposition* at 30.

[128] *Walkingstick Dixon*, 125 F.4th at 1334 (quoting *Throupe*, 988 F.3d at 1251).

is whether a reasonable factfinder could rationally find the employer's rationale unworthy of credence and hence infer that the employer did not act for the asserted non-retaliatory reasons."[129]  "When evaluating a potential pretext argument, '[the court] must not sit as a superpersonnel department that second-guesses the company's business decisions, with the benefit of twenty-twenty hindsight.'"[130]  The court does "not ask whether the employer's reasons were wise, fair, or correct."[131]  Instead, the court must "determine whether the employer honestly believed its legitimate, nondiscriminatory reasons and acted in good faith upon them."[132]  Iwasaki invokes two theories of pretext liability: the cat's paw theory and differential treatment theory.

## 1.   Cat's Paw Theory of Pretext

Iwasaki first argues the cat's paw theory of liability establishes pretext.[133]  Under this theory, a plaintiff may show pretext without having evidence of the "actual decisionmaker" possessing an unlawful motive by "presenting evidence that a biased subordinate who lacked decisionmaking power used the formal decisionmaker as a dupe in a deliberate scheme to bring about an adverse employment action."[134]  To survive summary judgment by employing this theory, Iwasaki "must show that there is a genuine issue of material fact that (1) the subordinate took action motivated by discriminatory animus; (2) the subordinate intended the action to cause an adverse employment action, and (3) the subordinate's actions proximately caused the intended

---

[129] *Id.* at 1337 (quoting *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015)).

[130] *Iweha v. State of Kansas*, 121 F.4th 1208, 1226 (10th Cir. 2024) (quoting *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1059 (10th Cir. 2020)).

[131] *Id.* (quoting *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007)).

[132] *Id.* (citation modified).

[133] *Opposition* at 29–35.

[134] *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514–15 (10th Cir. 2015) (citing *E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484–85 (10th Cir. 2006)).

adverse employment action."[135]  The court focuses on the final requirement.  Even if the court assumes Cookson acted motivated by discriminatory animus intending to cause Iwasaki's termination, the claim does not survive summary judgment because Iwasaki has produced insufficient evidence from which a reasonable jury could infer Cookson's animus was a proximate cause of Iwasaki's termination.[136]

Under the third step of establishing a cat's paw theory of pretext, Iwasaki must show "an unbroken causal chain connecting the biased employee's action to the unbiased decisionmaker's adverse decision."[137]  To prevail, Iwasaki must show more than mere influence or input by the bias subordinate in the decision making process.[138]  Rather, Iwasaki must show the biased subordinate proximately caused the termination.[139]  Proximate cause is met when "the decisionmaker placed uncritical reliance on" facts provided by the biased employee.[140]

The employer defeats a cat's paw theory "by showing a break in the causal chain, or a lack of uncritical reliance by the unbiased decisionmaker."[141]  The causal chain is broken if the employer conducts an investigation of the facts to independently judge the propriety of the

---

[135] *Singh v. Cordle*, 936 F.3d 1022, 1038 (10th Cir. 2019) (citation modified); *see also Thomas*, 803 F.3d at 515 (stating to survive summary judgment plaintiff must show "there is a genuine issue of material fact as to (1) the retaliatory animus of the subordinate, and (2) whether the subordinate's animus translated into retaliatory actions that caused the decisionmaker to take adverse employment action").

[136] *Iweha*, 121 F.4th at 1228; *see also Thomas*, 803 F.3d at 516–17.

[137] *Iweha*, 121 F.4th at 1228.

[138] *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1060 (10th Cir. 2009).

[139] *Iweha*, 121 F.4th at 1228.  The Tenth Circuit cases relied on by the parties impose two different standards under the third element of cat's paw: proximate causation and but-for causation.  *Compare Singh*, 936 F.3d at 1038 (proximate causation), *and Iweha*, 121 F.4th at 1228 (same), *with Byrnes v. St. Catherine Hosp.*, 158 F.4th 1107, 1123–24 (10th Cir. 2025) (but-for causation).  Since both parties argue proximate causation, the court applies that standard.  *See Opposition* at 32; *Reply* at 10.

[140] *Iweha*, 121 F.4th at 1228 (citing *Singh*, 936 F.3d at 1038).

[141] *Id.*; *see also Pinkerton*, 563 F.3d at 1061 ("Because the plaintiff must demonstrate causation, 'an employer can avoid liability by conducting an independent investigation of the allegations against an employee.'" (quoting *BCI Coca-Cola*, 450 F.3d at 488)).

termination.[142]  "An independent assessment by" either the HR person conducting the investigation or the decisionmaker relying on HR's investigative report "would break the link the causal chain and defeat" a cat's paw theory.[143]  Including the employee's version of events bolsters the investigation's independence because "such an inquiry demonstrates that 'the employer has taken care not to rely exclusively on the say-so of the biased subordinate.'"[144]

Iwasaki advances three arguments to establish proximate causation: (1) Cookson tainted the investigation by influencing the McVey and Dailey statements and providing impermissible input, (2) the investigation was not independent because it failed to include Iwasaki's version of events, and (3) People Services admitted Cookson tainted the investigation.  Considering each argument in turn, the court concludes the evidence does not support a causal relationship between Cookson's actions and Iwasaki's termination.[145]

First, Iwasaki argues Cookson impermissibly tainted the investigation.[146]  But her argument is not supported by the record.  Darling made the decision to terminate Iwasaki.[147]  Darling's decision was based on Roberson's report of the Dailey Incident, which was based on first-hand knowledge from the trainee Dailey and the inflight instructor McVey.[148]  After

---

[142] *Iweha*, 121 F.4th at 1228; *see also BCI Coca-Cola*, 450 F.3d at 485; *Singh*, 936 F.3d at 1038 ("One way an employer can 'break the causal chain' between the subordinate's biased behavior and the adverse employment action is for another person or committee higher up in the decision-making process to independently investigate the grounds for dismissal.").

[143] *Iweha*, 121 F.4th at 1230.

[144] *Thomas*, 803 F.3d at 516–17 (first quoting *BCI Coca-Cola*, 450 F.3d at 488; then citing *Pinkerton,* 563 F.3d at 1061); *see also Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231–32 (10th Cir. 2000) (finding it "important" that "in the course of his investigation" the decisionmaker asked the employee "to give his version of the exchange," but the employee declined to do so (citation modified)).

[145] *Pinkerton*, 563 F.3d at 1061.

[146] *Opposition* at 32.

[147] *Darling Dep.* at 61:1–63:21 (testifying she made the final decision to terminate Iwasaki).

[148] *Id.* at 61:4–15; *see also Exhibit A* at 9–10 (Dailey Statement); *Exhibit A* at 4–5 (McVey Statement).

receiving McVey's statement, Roberson followed up with some clarifying questions to her.[149] Roberson also contacted Decell that afternoon to further understand the Wifi-connectivity issues.[150] Per Roberson's request, Decell sought further information from the other individual named Molly and relayed it back to Roberson in the same message thread.[151] This is an independent investigation that broke any causal chain between Cookson's alleged bias and Iwasaki's termination.

Cookson did not witness the Dailey incident as she was working remotely at that time. Cookson did not submit a statement for the investigation. Cookson was not included in the email chain where Roberson recommended termination to Darling, and Cookson did not attend the termination meeting.

To overcome this lack of evidence, Iwasaki argues Cookson impermissibly tainted the eyewitness statements that led to Roberson's report.[152] Cookson did prompt McVey to provide a statement. When McVey "let Rachel Cookson . . . know about the [Dailey Incident], . . . Cookson instructed [McVey] to have Anita [Dailey] write a statement (as well as [McVey]) and send it to People Services."[153] And in her email to People Services, McVey said, "Per Racheal Cookson's direction, I have written a statement of events from this morning. Please see attached."[154] At oral argument, Iwasaki's counsel argued the court should infer from this record that Cookson influenced the content of McVey's statement which caused the ultimate

---

[149] *Roberson Dep.* at 225:24–227:4 (testifying that she discussed the statement with McVey); *Exhibit O* at 2–4 (email exchange between Roberson and McVey regarding McVey's statement).

[150] *Exhibit 3* at 124–29 (messages between Roberson and Decell on January 23, 2024).

[151] *Id.*

[152] *See Opposition* at 39–41; *Sur-Reply* at 8–9; *Minute Entry* (further addressed at oral argument).

[153] *Exhibit A* at 4 (McVey Statement); *see also Roberson Dep.* at 225:16–20.

[154] *Exhibit 3* at 3 (McVey email to Roberson and People Services).

termination decision.[155]  But that is not a plausible inference.[156]  Cookson telling McVey to write a statement does not give rise to the inference that Cookson told McVey what to say in her statement.  Further, even if the instances in the record of Cookson's animus towards Iwasaki did render that inference plausible, Cookson telling McVey what to include in the statement does not give rise to the secondary inference that McVey followed Cookson's direction and misrepresented the Dailey Incident in her statement.  That is not a plausible inference but rather a new fact that is nowhere in the record.  The court therefore concludes Cookson did not influence the content in the McVey Statement.

Similarly, the evidence in the record does not support the argument that the Dailey Statement was tainted by Cookson.  Immediately after the Dailey Incident, while Dailey was still "crying and shaking," McVey told her she could reach out to People Services and provided the email address.[157]  About two hours after the incident, Dailey emailed her statement directly to People Services.[158]  Iwasaki's reliance on Cookson's later instruction to McVey have Dailey provide a statement is misplaced.  The statement was already in the works irrespective of Cookson's actions.  Indeed, McVey responded to Cookson that she "had already instructed" Dailey that "if she was wanting to report anything to HR, it would be best to start writing down a detailed statement while it was fresh in her head."[159]  There is no evidence in the record of Cookson speaking to Dailey or otherwise influencing the statement that Dailey wrote and emailed directly to People Services less than two hours after the incident.

---

[155] *Minute Entry*.

[156] *See Lazy S Ranch Props*., 92 F.4th at 1198 (explaining the court makes plausible inferences in the light most favorable to the nonmovant at summary judgment).

[157] *Exhibit A* at 4–5 (McVey Statement).

[158] *Id.* at 9–10 (Dailey Statement emailed to People Services at 7:26 AM); *see also id.* at 10 (McVey Statement explaining the Dailey Incident occurred at approximate 6:40 AM).

[159] *Id.* at 4–5(McVey Statement).

There is a dispute as to whether Cookson was informed of Iwasaki's termination beforehand and, if so, whether she provided any input. But this dispute is not material. Viewing the evidence in the light most favorable to Iwasaki, Cookson's involvement was at most minimal. Finklea testified that Darling informed Cookson before the termination occurred.[160] She also testified, "I was not involved in, like, a discussion about whether she should be terminated or not . . . I *think* that was more of a discussion between Heidi [Darling] and Dina [Roberson] at that point. And Rachael Cookson."[161] Roberson at one point testified that Cookson was involved in the decision but immediately clarified that she meant Rachel Finklea and it was not Rachel Cookson at all.[162] Decell testified that Cookson was the manager and had final say over terminating instructors within her department, but that Darling "would have had final say over" Cookson.[163] And Darling testified that she made the final decision to terminate Iwasaki, and did not recall ever talking to Cookson about the decision.[164] In addition to the deposition testimony, Iwasaki relies on a one page spreadsheet for which no witness was able to explain its creation, accuracy, or otherwise provide any other foundation for.[165] At most, the spreadsheet indicates Iwasaki was terminated and Cookson was the "Decision Maker."[166] But as

---

[160] *See Finklea Dep.* at 69:2–20.

[161] *Id.* at 68:3–15.

[162] *Roberson Dep.* at 220:5–14 ("Q. But again it was Rachael Cookson that made the decision to terminate Ms. Iwasaki? A. No, Rachel Finklea. Q: Rachel – A. Finklea. Q. – I've been saying Cookson. So you're saying it was Rachel Finklea? A. Yes. Q. It was not Racheal Cookson at all? A. No.").

[163] *Decell Dep.* at 38:24–39:2, 154:21–155:7.

[164] *Darling Dep.* at 61:16–21 ("Q. Do did you talk to Rachael Cookson about your decision to terminate Fumiko? A. I don't recall ever talking to Cookson about it, only because she wasn't there physically, and it was a day of. Like we got the information and we the decision that day."); *id.* at 63:17–21 ("Q. So you – as you sit here today, you're saying you made the final decision . . . to terminate Fumiko? A. Correct.").

[165] *Exhibit 3* at 61; *Roberson Dep.* at 206:21–208:24 (Ms. Roberson not recalling the document, although commenting it resembled something she used to track employee complaints); *Darling Dep.* at 94:11–95:20 (Ms. Darling stating she had never seen the document and it contained inaccurate information); *Decell* at 90:1–92:5 (Ms. Decell not being asked foundational questions but stating the document's listing of Ms. Cookson's name does not mean she was the final decisionmaker for Plaintiff's termination).

[166] *Exhibit 3* at 61; *Decell Dep.* at 90:7–12 (testifying the first row would refer to Iwasaki).

Decell testified, the document listing Cookson does not mean she was the final decisionmaker since Darling is the Director.[167]  In sum, the witnesses who were involved in the decision-making process did not provide any evidence concerning what information Cookson contributed to the investigation, that such information was included in the investigation, nor that such information in fact influenced the ultimate termination decision.

Thus, while this dispute might be genuine, it is not material.  A material fact must "affect the outcome of the suit" under the governing substantive law.[168]  At most, Cookson was informed of the decision and perhaps provided information that was included in the investigation.  But that alone does not preserve a causal chain.  An independent investigation may include information from the bias subordinate.[169]  For example, in *Thomas v. Berry Plastics Corp.*,[170] the Tenth Circuit found the employer's independent investigation broke the causal chain when the two decisionmakers reviewed information from the biased subordinate, seven other supervisors, and the employee himself.[171]  Here, the independent investigation primarily relied on the statement from two neutral eyewitness, the affected trainee and a neutral coworker.  Whether Cookson provided any input is immaterial, as there is no evidence in the record identifying the information Cookson provided or any reliance on such information by the actual decisionmakers.[172]  Indeed, a "necessary element to a cat's paw claim is the decisionmaker's

---

[167] *Decell Dep.* at 90:1–92:5.

[168] *Liberty Lobby*, 477 U.S. at 248.

[169] *Thomas*, 803 F.3d at 516–17.

[170] 803 F.3d 510 (10th Cir. 2015).

[171] *Id.* at 516–17.

[172] *See Iweha*, 121 F.4th at 1230–31 (requiring plaintiff show decisionmaker "uncritically relied on the coworkers' discriminatorily biased allegations—such that her report and termination recommendation were tainted by such bias").

uncritical reliance on facts provided by a biased employee."[173]  Here, Iwasaki fails to both identify those facts and provide evidence of *any* reliance—much less uncritical reliance.

Second, Iwasaki argues the investigation's failure to include her version of events establishes causation.[174]  But that is not required.  The Tenth Circuit has explicitly held the inquiry into pretext centers on "the independence of the employer's investigation, and not the employee's opportunity to respond."[175]  Including Iwasaki in the investigation would have bolstered its independence but not including her does not destroy it.[176]

Finally, Iwasaki argues People Services "admitted that looking back, their decision may have been 'tainted' by Cookson," which establishes causation.[177]  But the record does not include evidence supporting this fact.[178]  During Roberson's deposition, she was pressed on whether Cookson "could have tainted the facts and statements that were given to" her while investigating the Dailey Incident, to which she first responded "I couldn't say," and then "I do not know," before finally responding "it is possible."[179]  First, the question called for speculation and would be inadmissible on that basis.  And second, even if this evidence was admissible, there is no evidence that what was "possible" indeed occurred.  The only other evidence Iwasaki cites is her own purely speculative testimony that she thought Cookson had influence on the decision-

---

[173] *Id.* at 1228 (citation modified) (quoting *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1294(10th Cir. 2013)).

[174] *Opposition* at 40.

[175] *Iweha*, 121 F.4th at 1229 (quoting *Parker v. United Airlines, Inc.*, 49 F.4th 1331, 1339 (10th Cir. 2022)).

[176] *See id.*

[177] *Opposition* at 40.

[178] *See Jones*, 772 F. App'x at 697 (holding an "unsupported opinion is not sufficient to establish a genuine issue" of fact).

[179] *Roberson Dep.* at 122:1–17.

makers.[180]  But she was not involved in that decision, and she cites no evidence showing Cookson was involved in the Dailey Incident investigation.

The record shows Roberson conducted an independent investigation in the Dailey Incident and Darling made the decision to terminate Iwasaki primarily off the ensuing report. Iwasaki fails to present evidence of a causal chain between Cookson's bias and Iwasaki's termination.  Upon this record, no reasonable jury could conclude any act by Cookson was a proximate cause of Iwasaki's termination.  Accordingly, the cat's paw theory of pretext fails.[181]

2.  Differential Treatment Theory of Pretext

Iwasaki also attempts to establish pretext by arguing she was treated differently than either her male colleagues or Cookson.[182]  Pretext may be established by showing the plaintiff "was treated differently from [1] other similarly situated, nonprotected employees who [2] violated work rules of comparable seriousness."[183]  Iwasaki must first show she is similarly situated to her male colleagues and Cookson "in all relevant respects."[184]  Similarly situated employees must "deal with the same supervisor"; be "subject to the same standards governing performance evaluation and discipline"; and have comparable "relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the

---

[180] *Iwasaki Dep.* at 243:14–23.

[181] At oral argument, Iwasaki advanced a new theory that People Services was so tainted by Cookson before the Dailey Incident occurred that Roberson "entered into the investigation with the end goal in mind," such that the court should not look into the independence of the investigation.  *Minute Entry*.  This argument does not appear anywhere in Iwasaki's briefs.  *See Opposition*; *Sur-Reply*.  The court will not consider new theories raised in the first instance at oral argument.  *See Deseret Tr. Co. v. Unique Inv. Corp.*, 2018 WL 8110959, at *3 (D. Utah July 3, 2018) (explaining "this court ordinarily does not consider arguments raised for the first time in a reply brief or at oral argument.  The local rules expressly prohibit raising in a reply brief matters not raised in an opposition memorandum.  And the natural extension of the rule necessarily precludes parties from raising at oral argument what they could not have raised in reply." (citation omitted)).

[182] *Opposition* at 34.

[183] *Green v. New Mexico*, 420 F.3d 1189, 1194 (10th Cir. 2005) (quoting *Kendrick*, 220 F.3d at 1232).

[184] *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006).

intended comparable employees."[185]  If she establishes the similarly situated element, Iwasaki

must then show those employees violated "work rules [] of comparable seriousness to [her]

violations."[186]  The similarly situated employees must have violated the same work rules to the

same degree and frequency to show pretext.[187]  Applying this standard, Iwasaki fails to meet her

burden for either the male inflight instructors or Cookson.

Iwasaki fails to show the similarly situated male instructors violated rules of comparable

seriousness.  During oral argument, Iwasaki's counsel argued the male instructor also deviated

from FAA curriculum without comparable discipline.[188]  But this is insufficient to satisfy

differential treatment.  The impetus for Iwasaki's termination was the Dailey Incident, and the

record does not provide any instances of the male instructors engaging in similar conduct.

Iwasaki also fails to show Cookson is a nonprotected, similarly situated employee.

Iwasaki brings a sex discrimination claim.  Cookson is another female employee who is also

protected.  Because Cookson is a protected employee, she cannot serve as a nonprotected

comparator.[189]  Cookson is also not similarly situated because she is Iwasaki's supervisor.  A

supervisor and a subordinate are not similarly situated to one another.[190]

---

[185] *Id*. (citation modified); *see also Green*, 420 F.3d at 1194 ("A similarly situated employee is one who deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline.").

[186] *Cooper v. Wal-Mart*, 296 F. App'x 686, 694 (10th Cir. 2008); *see also McGowan*, 472 F.3d 745.

[187] *Cooper*, 296 F. App'x at 694 (affirming summary judgment where employee did "not proffer[] evidence of violations by other store managers' violations of comparable seriousness to his own misconduct sufficient to carry his burden of persuasion in showing pretext").

[188] *Minute Entry*; *AMF* ¶ 13.

[189] *See Green*, 420 F.3d at 1194 (requiring the similarly situated employee be "nonprotected"); *see also Kendrick*, 220 F.3d at 1232 (same).

[190] *See Green*, 420 F.3d at 1194 (finding subordinate was not similarly situated to a supervisor in a different unit).

Accordingly, Iwasaki fails the third step of *McDonnell Douglas*.  Because she fails to show Breeze's articulated justification to be pretextual, Breeze is entitled to summary judgment on the discrimination claim.

### III.    Title VII and Section 1981 Retaliation Claims

Iwasaki also brings claims for retaliation under Title VII and Section 1981.  She alleges her termination was in retaliation for reporting that racial minorities were failing their exams at higher rates than non-minorities, that Cookson was engaging in gender-based discrimination, and that Cookson was retaliating against Iwasaki after learning that she had filed a complaint against Cookson.

The *McDonnell Douglas* framework also applies to this claim.[191]  "To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action."[192]  Once Iwasaki establishes a prima facie case, the burden shifts to Breeze to articulate a legitimate, nondiscriminatory reason for her termination.[193]  As with Iwasaki's termination claim, Breeze states the following as reasons for the termination: "(1) violation of the company values of 'kindness, integrity, and excellence,' (2) gossiping about coworkers, (3)  violating a nondisclosure agreement for Breeze's confidential information, and (4) being unwilling to receive correction from her supervisors."[194]  Then, the burden shifts back

---

[191] *Walkingstick Dixon*, 125 F.4th at 1339.

[192] *Id.* (citation modified).

[193] *Id.*

[194] *Motion* at 20.

to Iwasaki to show these reasons are pretextual.[195]  Like in Title VII discrimination claims, a plaintiff bringing a retaliation claim may rely on the cat's paw theory to show pretext.[196]

Even if the court assumes the first two steps are met,[197] Iwasaki fails to establish the third step—pretext.  As with her discrimination claim, Iwasaki relies on the cat's paw theory to show pretext here.[198]  She argues the decisionmakers relied on facts provided by Cookson such that Cookson's animus can be imputed to Breeze.[199]  But, for all the reasons explained above,[200] Cookson fails to show pretext.  Accordingly, Defendants are also entitled to summary judgment on this claim.

In the alternative, Iwasaki argues her retaliation claim is also based on her being placed on the PIP.[201]  But as the Tenth Circuit has clearly stated, "a PIP, standing alone, is not an adverse employment action."[202]  To be an adverse employment action, the plaintiff "must show they suffered some harm respecting an identifiable term or condition of employment," such as to their job, pay, or benefits.[203]  Iwasaki generally asserts the "PIP and resulting termination easily satisfy this standard given Plaintiff's provided facts based on the record."[204]  But this is insufficient.  Iwasaki has failed to show the termination was retaliatory for the reasons explained

---

[195] *Walkingstick Dixon*, 125 F.4th at 1339.

[196] *Id*.

[197] *See Iweha*, 121 F.4th at 1234 (stating the court "may assume without deciding" step one when a retaliation claim fails to show pretext).

[198] *Opposition* at 38–40.

[199] *Id.*

[200] *See supra* Section II.C.

[201] *Opposition* at 38–39.

[202] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1224 (10th Cir. 2006).

[203] *Scheer v. Sistern of Charity of Leavenworth Health Sys., Inc.*, 144 F.4th 1212, 1213 (10th Cir. 2025) (citation modified); *Tapie v. City of Albuquerque*, 170 F. App'x 529, 534 (10th Cir. 2006).

[204] *Sur-Reply* at 9.

above, and she fails to articulate any harm other than the PIP itself.  Because she does not satisfy her burden, this argument necessarily fails.

Accordingly, Defendants are entitled to summary judgment on the retaliation claims.

## CONCLUSION

For the reasons explained above, Breeze's Motion for Summary Judgment is GRANTED.[205]  The Clerk of Court is directed to close the case,

SO ORDERED this 13th day of July, 2026.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge

---

[205] Dkt. 42.